We will hear argument this morning in Case 24-813 in Chevron v. Plaquemines Parish. Mr. Clement. Mr. Chief Justice, and may it please the Court, Congress amended the Federal Officer Removal Act in 2011 and added the words related to. Both before and after that amendment, this Court emphasized those are words of substantial breadth, meaning connected to or associated with. Thus, the import of Congress adding those capacious words to the statute is hard to deny, so much so that respondents effectively spend very little time defending the lower court's reasoning unrelated to. Instead, they shift their focus to acting under, which is a distinct requirement of the statute addressing who can remove and an issue on which they lost unanimously below. That effort to change the subject does not work. The classic person who acts under a government official is a government contractor providing the government with what it needs to win a war. Thus, no one doubts that the refining of avgas under Federal contract satisfies the acting under condition. The only question is whether that refining activity under contract is connected to or associated with the production activities assailed in these lawsuits. The answer to that question is straightforward. The petitioners here produced the very kinds of crude that were the indispensable component of the avgas they refined under Federal contract, and the contracts themselves drew the connection between avgas and crude by pegging the price that the government paid for refined avgas to the price of crude and the government promising that it would rebate any new taxes on crude. What is more, if the petitioners' production of crude had been enjoined by a state court during World War II, the Federal government's efforts, the war efforts, would have suffered. Now, respondents think that it's anomalous to allow only the vertically integrated producers to remove to Federal court. I don't think there's anything odd about allowing people in direct privity with the Federal government to remove, but any anomaly can be alleviated by leveling up and allowing everyone who produced crude under the direct supervision of the Federal government under the unique circumstances of World War II to remove, as the Solicitor General suggests. Either way, this court belongs in Federal court. I welcome the court's questions. Mr. Clement, how would your argument differ if this were pre-2011? So, I think my argument would be a lot tougher pre-2011, because obviously before 2011 the statute would have said for, not for or related to. Now, I might have given it the college try, and even under for, and of course if you get to the Solicitor General's sort of, or our alternative argument, I think then we could satisfy the statute even pre-2011. But that would require, as we think is correct, understanding that this isn't ordinary regulation of the type that was at issue at Watson. This was close supervision of what effectively amounted to a joint venture during World War II to get as much oil out of the ground, transported to the refineries, that the government was helping to finance to expand, all in an effort to get petroleum products, in particular avgas, onto the war front. So I think we could have won under that theory even pre-2011, but I do think the statute would have won. But you do admit that this is quite a dramatic change to the removal statute. I would say it's a substantial expansion of the statute, but of course it's a substantial expansion that I think follows directly from the words that Congress added to the statute. And that's why I think it's really relevant that the plain meaning, the dictionary definitions of related to, always had a broad meaning, and of course this Court, in cases like Morales, had said this is a very broad term, and Congress added it anyways. And so I think we should sort of take Congress at its word in the text of the statute. But Mr. Clement, in the text of the statute, Congress also says that adding those words was a conforming amendment. And we have case law that indicates that conforming amendments don't make substantial changes. So I'm a little worried about the suggestion that this is a substantial change in light of Congress's statutory statement that this is a conforming amendment. So, Justice Jackson, I would say you have cases that go both ways on this. You certainly have the case, and the case that the Fifth Circuit en banc relied on and rejected in this argument is Burgess v. United States, which stands for the proposition that even a conforming amendment is a real amendment and you give the words their effect. And in my reading of the cases that go the other way, they don't really deny that words that pass through bicameralism presentment have to be given their effect. In cases, sometimes you go through the analysis, effectively determine that the words don't have a dramatic effect, and then note at the end of the analysis that it was a conforming amendment. But we do have amicus here, an amicus brief that talks about another option that really does make sense of the conforming amendment analysis. In other words, this amicus, and I'm referring to the Governor John Bel Edwards brief, indicates that in the House report and in the legislative history, Congress explained that what it was trying to do when it added or relating to was expand the types of actions that could be brought. In other words, there had previously been concern that pre-discovery suits were not able to be removed. Congress explicitly changed the statute to include them and then put or relating to, says the amicus and the House report, it put or relating to as a conforming amendment to that change. So what's your response to that theory, which doesn't require us to view or relating to in its broadest sense? So two things, Your Honor. One thing would be a textual response. One would be a response based on the House report. So first, the textual response is there's no way, given what Congress did to the text of the statute, to limit it to the pre-suit discovery actions that were concededly the immediate impetus for Congress getting concerned about this issue. Congress could have passed a statute that said something like for or in pre-suit actions relating to, and then it would have had this limiting effect where related to only modified those pre-suit actions that were added to the definition of civil action and criminal proceeding as part of the rest of the statutory amendments. So there's just no way, given the words that they added in the various parts, to sort of limit it in the way that the amici would sort of wish. But the second thing is, for those that look at House reports, if you actually look at the House report, it has a section-by-section analysis, and there is a specific explanation of what the House thought it was doing in 2B of the statute, which is the specific provision, call it a conforming amendment, but the specific provision that added the related to language. And Congress said that it was rewriting the statute to essentially expand the universe of suits that could be removed to acts that could be removed by federal officers to federal court. I'm sorry, finish. I was just going to say, so in the one place in the section-by-section where that House report says specifically what they're trying to do, they say we're trying to broaden the universe of acts, not actions, acts, that federal officers can remove to federal court. I'm sorry. How far upstream do you carry relating to? Let's say you have a vertically integrated company, a lot of inputs, changes along the way, and at the end of it, they're selling a product to the government. Does relating to go to the step that's 10 steps above that, where they're buying the materials, they're shaping the material, all this other stuff? I would say probably not, and I think any time you're dealing with a word like related to, there's going to be some degree of attenuation at some point where you're going to say, you know, fun's fun, but don't die laughing. We're going to cut it off before that point. Now, I would think here there are a couple of factors that make this a relatively straightforward case. First of all, you don't have to go that far upstream. We are talking about the absolute indispensable component, which is this particular grades of crude. The other thing you have here that I think it makes it a relatively straightforward case is that you have the contract itself drawing the connection between avgas and crude. I mean, literally what the government agrees to pay for the refined avgas that it's purchasing is based on the price of crude in the East Texas field, so the connection is very direct there. The last thing I'll say, and this is, you know, I guess the closest to something that would be like a test or a formulation that might give guidance, but I think if you ask the question, would enjoining the activity that the petitioners engaged in have a direct negative effect on the government, I mean, the answer here is clear. If you'd enjoined the production activities during World War II, that would directly affect the government's ability to get refined avgas, to fight the war effort. If you go 10 steps upstream to an ingredient that one company adds and nobody else adds, I think if you ask the question, would this interfere with the federal government's functioning, the answer would be no, but here it's clearly yes. I'm not sure that's satisfactory to me. The way you're defining this, but for now, something could fall apart. So how about an employer strike or an employment dispute of a critical engineer of some sort? So I guess what I would say about that is it might depend. I mean, here, for example... Depend on what? That's the problem. Well, I think it would depend on how... If we define it as capaciously as you do, I'm not sure what the stopping point would be or how we would limit the application of this case. Well, I guess I'd ask you to think about it this way. I mean, I would think, I mean, there are provisions in this contract that go to working conditions. Now, here, the contract went out of its way to say that the FLSA should apply here. But if the contract said something to the contrary and a state tried to apply its minimum wage law to the refinery itself, then I think that would be a situation where you would probably satisfy the statute and you could remove... But you seem to be arguing that the only defense is a federal defense, which is part of the test, right? You certainly need a federal defense. And as Judge Oldham made clear below, I think that's something that does a lot of the limiting work on this statute. And I do think it's relevant to keep in mind here that, you know, obviously this court is concerned about these broad terms and coming up with limits, but the stakes here are a little bit lower in two respects. One, in the ERISA context, for example, or the Airline Deregulation Act context, the relating to is the whole game. I mean, it's going to determine whether state law is displaced. Here, it's just one of three or four factors, depending on how you count them. And then the second thing is the net result of this is not that your state law claim is displaced. It's just that you would have to bring your state law claim in a different forum. I didn't see your brief taking on the government's position that strongly, but you did so here in your opening statement. And you answered Justice Thomas by saying that the government's position would expand our case law in saying that regulation alone could give you the nexus. So how would you limit the government's position, that it's not regulation alone? It's regulation plus what? Well, I guess I would say it's – I mean, you could come at it two ways. You could come at it and say it's regulation plus close supervision and control as a practical matter, and I think you had this here. But that's true of most regulation, environmental regulation, for example. So I don't think that standing alone is enough. So let me give you my alternative theory, which is maybe not to say – think about it as regulation plus, but regulation to what end? I mean, in Watson, you have the classic kind of more typical government regulation, where they're regulating, but they're regulating the provision of a product to a third party. The government's not buying light cigarettes. The government, probably all things being equal, would probably prefer there are less light cigarettes in the world than more. So it's kind of classic, the government as government regulating. These regulations, I think, are better understood as the government as procurer regulating in service of maximizing its procurement objectives. I mean, part of the reason that they're in there regulating the spacing of the drill isn't because they have, like, some newfound federal interest in drill spacing. It's that they're trying to make sure that they can get material out of the ground quickly, that they can do it in a way that preserves steel, which is scarce during the wartime. And so, really, all of these various regulations, including the regulation of production, is done in service of procurement. And that's just a very different situation from what this court had in Watson, but it's also a very different situation from the mine run of regulation in all these cases. I mean, there's another amicus brief supporting my friends that goes through all of these federal cases involving poultry, involving nursing homes during the pandemic, and it's an interesting sort of litany of cases. But the federal courts in all of those cases were able to say, no, those stay in state court. And I think if you recognize that the kind of regulation here is distinct in the World War II context, I think that would be one way to reverse the decision below but still not open up any floodgates. Mr. Clement, let's imagine that I agree with you about the definition, about the causal connection here, and I think it's broad. I'm trying to decide what would be left on remand if I took that position, whether we should just remand and let the Fifth Circuit figure it out and apply the law to the facts, or whether we should do that ourselves and actually hold that the suit is removable. One thing I'm worried about is the colorable federal defense. Fifth Circuit didn't pass on that below. And you say that respondents don't dispute it, but the Fifth Circuit hasn't decided. Judge Oldham talked about it in his dissent. That's one thing. The other thing is we've never addressed whether the federal officer has to be a federal officer now or at the time the conduct occurred. And in the Meadows case, which was pretty recent, Chief Judge Pryor said, well, it has to be at the time currently, which would not apply to your clients. So if you could address those two. Well, there's a lot there. I mean, first, and let me make sure I don't forget either piece. So on the first piece, I mean, I think it's critical that this court, you know, not to say related to is the right test but should apply it because you want to provide some guidance to the lower courts. So I think at least you want to at least go so far as to saying this is a clear case that satisfies the test. If you want to leave the colorable federal defense issue for the Fifth Circuit on remand, you know, I'd prefer that you go ahead and just say it's not really in dispute. But in fairness, there hasn't been a lot of briefing on that, and in fairness, I'm not worried about that. I mean, you know, we raised a number of federal, colorable federal defenses, and I think at a minimum the preemption defense based on all these wartime regulations is an incredibly strong defense, and there's probably an immunity defense. So, you know, you could do that. So on your second question, well, what can I say? I mean, Chief Judge Pryor got that badly, badly wrong. I asked on behalf of Mr. Meadows for this court to take a look at it and fix it. This court wasn't interested. But, you know, the arguments are overwhelmingly strong that the Eleventh Circuit decision is wrong. But even the Eleventh Circuit, my understanding is, has not applied that in the government contractor case because, you know, I mean, there's a lot wrong with that approach, but one of the things is it's really hard to apply in the government contractor case because what are you saying? Like the contract officer that gave us the contract in World War II still needs to be alive or still needs to be on the job? I mean, that doesn't make any sense. Well, I don't know whether it makes sense or not because, as you say, we didn't take up that question before. I just don't want to implicitly resolve it here because it's a live one. It's not a live one on the Fifth Circuit on remand. You know, if you want to drop a footnote and say you're not deciding that case or that issue in the opinion, you know, that would be an appropriate approach, I think. Thank you, counsel. Justice Thomas? Justice Sotomayor? Justice Kagan? Mr. Clement, you spoke in your opening about the apparent anomaly between putting the vertically integrated oil companies in federal court and having the oil-producing companies that don't have refining capacity, didn't have refining capacity in state court. And you said we oughtn't to worry about that. But putting aside for now the Solicitor General's alternative theory, which would treat them alike, I mean, why isn't that just a bizarre outcome when you consider that this entire suit is about the thing that both sets of those companies have in common, not about the thing that separates them? So, again, I'll grant you that there's, like, a surface anomaly, if you will, which is why my clients in the first instance are, you know, the SG position is our position, our principal position in the Fifth Circuit until it's rejected in the Plaquemines 2 case. But what the Plaquemines 2 case says is, you know, our problem is under acting under, not really related to. And so, and even in the Plaquemines 2 opinion, it's like four pages long, it doesn't say much, but it does say maybe the refining companies are differently situated. And so, you know, so I think the anomaly goes away if you think about this as principally under acting under. It makes a big difference unless you accept my sort of modification based on the unique nature of these regulations. If you think the key problem is acting under, well, then it makes sense that the people who are in direct government contractual privity with the federal government get to remove and those that are not don't get to remove. And when acting under, are you saying that every federal contractor is acting under? So what I would probably say is, like in some theoretical way, if you're a government contractor, you could come in and say, I'm a government contractor, so check that acting under box. But it doesn't do you any good unless what you did under the government contract is related to the thing you're being sued for. So if Chevron is, you know, got a refining contract and they get sued for their geothermal operations or they get sued for operating a corporation-owned filling station, like related to is going to be absolutely impossible. And so you check one box, but you wouldn't get anywhere. I mean, you know, essentially everybody gets to check the I'm a person box, but that doesn't move the needle. So I wouldn't worry too much about saying, well, government contractors get to check the acting under box because they still have to get related to and they still have to show a colorable federal. And then unrelated to, which is pretty broad. So, you know, the fact that you still have related to, I'm not sure how much that work does in terms of limiting this. But, you know, take a hypothetical where it's not wartime and there's plenty of crude to go around and the government doesn't have a particular interest in what happens at the production level, as opposed to what happens at the refining level. But it's still, of course, true that the crude oil is the single component of the aviation gas. Is that enough? Sure. I think that is definitely enough. So all the rest is atmospherics. The fact that the government was super concerned about this and, you know, was really looking at the production activities too in order to ensure that the refiners got the crude that they needed. Even if that wasn't the case, just the fact that the crude was the component product is enough. It would be enough for the related to box. It's a lot more than atmospherics. It's, you know, part and parcel of why I don't fear the possibility of being remanded for the colorable federal defense prong here. If it were just ordinary non-wartime kind of generic stuff, I'm not sure what the colorable federal defense would be. But for purposes of the related to, I mean, I honestly think if you take the wartime context out of this and the government contracts with Chevron refining company, it's probably guessing that almost all of the crude is going to be produced by Chevron in the field because they vertically integrated for a reason. It's efficient for them to operate kind of as an internal corporate entity. So in some respects, you know, the wartime context had a little bit of the anomaly that we didn't refine as much of our own crude as we otherwise would have. But it also provides all this other direction and control that I think make the colorable federal defense an easy piece. The other thing it does, which is more than atmospheric, is I think it provides part of the answer to why contractual direction can't be the test. Because part of the reason the contract didn't have to specify anything more about production is because that's being regulated to a fare-thee-well by the Petroleum Administration for war. Justice Gorsuch. Justice Kavanaugh. There seems to be a concern about the fairness of the state court system that underlies your position in this case. What is that concern? So the concern is, in a nutshell, I mean, I'm not going to try to improve on Daniel Webster, right? Daniel Webster, talking about this in the context of 1812, said there's real value in having your case litigated in a forum that respects the federal authority. And so for, you know, really since almost the framing of the country, there's been this problem, this issue, this concern, with issues that are nationally important but locally unpopular. So War of 1812, not a lot of big fans of that in New England. You know, taxes after the Civil War or certain Civil War reconstruction things, not a lot of fans in the South. Those are the times when it's most important to be in federal court. And as we say in the briefs, I mean, I actually think that, you know, you can see this as a threat to federalism, but in some ways I think it works hand in hand with federalism because we're not saying that they don't get their chance to prove their case in court. It just has to be proven in a federal court. If they can prove their case in federal court, then everybody's going to accept the outcome and they're not going to view it as something that's a product of local prejudice. The last thing I'll say is there are some real procedural advantages to being in federal court in terms of the ability to get interlocutory appeals, the ability to get this court to review a cert petition when it's interlocutory. So as a practical matter, you know, it's not just like a difference in the jury pool, though that might make a little difference in a case, or it makes more difference than usual in a case like this where you still are going to have a regional jury pool, but it's not going to be drawn exclusively from people that are going to get, you know, effectively a direct benefit if the parish collects a massive windfall. Do you have specific concerns in this case about the state court system, or is it more the general concerns, historical concerns, and the procedural points that you just mentioned? Well, it's both. I mean, I'd be lying if I didn't say that the verdict in the one case that went to trial here, which was, you know, roughly $750 million for just one parish, you know, since the Fifth Circuit, the one time they took a look at one of these cases on a removal in a diversity context, basically said that, you know, the state has a fatal problem with its grandfather clause argument. So I'm looking at this case in practice. I'm seeing what happened in federal court, which is we won going away. I'm looking at what happened in state court and a $744 million judgment, and I'm thinking, yeah, you know, facial and ads applied. And then you mentioned earlier, and I don't know if you meant this to be a test, so I want to clarify whether you want this as something your suggestion should be in the opinion. Would enjoining the activity have a direct negative effect on the government? Was that something that you were suggesting as a test or just a comment you were making about the application of this case? Because the word direct could, of course, assume large significance going forward. Right. I'd live with that as a guidepost. If you were going to make it into a test, I'd take the word direct out. But, you know, I mean, this Court has approached this exact statutory language in sort of different ways. In Morales, the Court basically said, yeah, it's a broad term, and this is a relatively straightforward case, and we'll leave the rest for another day. So that's one option. In Watson, this Court with, you know, the acting under sort of did the opposite, where it said, all right, this is a broad term, we're supposed to liberally construe it, but we can look to the broader purposes of the statute, and the broader purposes of the statute, it's the same statute, is to provide a federal forum in circumstances where you would interfere with the federal government's operations. So I can sort of live with that approach, too. There's kind of an intermediate where you say, like, there's three or four factors that make this an easy case, and those are relevant, but we can wait for the next case when only three of the four factors are present. Thank you. Justice Barrett? A couple of factual questions. I'm thinking about how subtle the factual record is here for purposes of applying a test. It seems like there was — I understand all the reasons why PAW is a federal agency from your point of view. I understand all of the evidence from that. But I — do you understand respondents to contest that point at all? Because it seems in some places like they cast doubt on it. Is that subtle? I mean, I think it's subtle beyond any reasonable debate, but I suppose if there really were a debate on that, you know, this is a context where if you think there's a factual dispute, you essentially defer to the plausible allegations in the removal petition. And, you know, I think based on that, we're more than plausible. I mean, we have the official history that supports, I think, really what we're saying. Now, like, you know, they point out that, well, you know, the state still had some residual role in regulating production. I don't think they're wrong about the fact that the state still had some residual role, but there's just — it's black and white in terms of the federal government's role in the war versus outside of the war. So — but in all events, if you thought there was a factual dispute, you still end up deferring to the plausible allegations in the removal petition, and any factual issues get sorted out in federal court, not in state court. Okay. Second question is Louisiana says that you grossly mischaracterize whether the state is trying to hold you liable for the World War II activities. You know, Mr. Arbuinata says, no, no, no, no, this is just about the defense. The only thing that's relevant is they're showing that the activities were lawfully commenced before the Louisiana statute was enacted. I read the expert report, and I can see why. Right. Is it the expert report that's leading you to say that, yes, we're actually being held — they're trying to hold us liable for that as opposed to having it be relevant solely for the defense? So, I mean, I think as a practical matter, it was the expert report that sort of started the whole re-removal effort, and I think even the Fifth Circuit, when it considered that, said, yeah, you know, World War II is directly at issue here. I mean, you know, there were hints of that even in the original complaint, because if you look at the complaint, they're asking — one of the, you know, forms of relief is to restore this to its original condition. And, of course, you know, there's nothing more effective in a state court sort of jury presentation than a before-and-after presentation, and the before-and-after photos they want to show are the bayou before the war and now in sort of 2026, whatever it is. And so, you know, that's a much less effective demonstrative if it's 1981 to now, and there's still even further problems. But if they would have strictly limited this to 1980 forward, we wouldn't have this argument based on World War II. But, again, the Rozelle expert report, I think, speaks for itself.  Justice Jackson? So, assuming that I think that of or relating to was just a mere conforming amendment and, therefore, we're still in the land of causal nexus but for nexus, I thought your client had a pretty good argument that you satisfied that, but it seemed like you were giving it up in your conversation with Justice Thomas. So can you help me to understand? Maybe I'm misunderstanding what is necessary for causation, but I thought that the argument was that there was a connection, a sufficient nexus between the ag gas contracts and the production of crude oil, which is what is being alleged here. So I didn't mean to give that up, and I thought I specifically said I'd give it a try. So let me give it a try. Please. I mean, yes, you could say that this is the unusual case where even if you have a causal nexus test of some sort, we would still satisfy it. In fact, I had a colloquy with the circuit judge in this case who proposed but for as the test, and I thought we could satisfy but for if it's the test. I don't think it is the test, but I think we could satisfy it here because it is both the reality that we did refine a substantial amount of crude from our own fields in these cases, and it is also an undeniable reality that the crude here is the absolute indispensable component. I mean, there's this great line. I thought all the arguments and the things that you were saying, for example, to Justice Kagan and stuff about the wartime context and the actual product here was your answer to why this would satisfy but for contact. Yeah, I mean, I agree. There's a great line in the PAW history that's reproduced at Joint Appendix Page 5 that basically says, look, oil starts in the earth, and without crude, all of those towering wartime refineries would lay idle. So, you know, there's no question that the crude in general is the but for cause. Now, I think my friends are going to get up here and say, well, but the contracts would have allowed you to use different crude that you purchased on the open market as opposed to the crude that you produced, and that's the argument that tripped up the Fifth Circuit. But just to be as clear as I can, one way for us to win is the way that you're talking about that it's just but for. The other way for us to win is, you know, and that was what I was trying to say to Justice Thomas, is even apart from the 2011 amendments, if you think the production activities are under federal authority because of the pervasive wartime regulation, then it's not, I don't need related to at all, then it's for the activity. Let me just ask you really quickly about the Fifth Circuit's opinion, because I understood them to be requiring a contractual directive with respect to crude oil production, and it seems to me that that test is even more stringent than a but for. Am I right about that? I mean, that's what seems wrong about the Fifth Circuit's test. You are absolutely right about that, and that's why I thought I could tell the Fifth Circuit that we could live with but for, but we can't live with contractual direction. Thank you. Thank you, Counsel. Mr. Roper? Mr. Chief Justice, and may it please the Court. By assisting the federal government in obtaining a critical wartime product under federal supervision, petitioners acted under a federal officer in refining avgas. That refining is an act under color of federal office that can support removal, and these suits relate to that act because they target the production of the crude oil that was the key ingredient in avgas, and that the federal government linked to that refining by both contract and regulation. Respondents go all in on their alternative argument, that petitioners must have been acting under a federal officer in the crude production that these suits are for, but the statute contains no such requirement, which would nullify Congress's addition of relating to. Regardless, petitioners were acting under a federal officer in producing crude, given the Petroleum Administration for War's unique role supervising production to further the war effort. I welcome questions. Would your approach apply to contract disputes with employees also? Yes. In our view, if we're talking about the sort of direct thing that is going into the product, and, of course, labor is a critical component of creating a federally contracted product, that is a sufficient connection. You, of course, don't need to even go that far for petitioners to win this case. But we have readily acknowledged that there are going to be hard-line drawing problems here, although I agree with Mr. Clement that the federal defense requirement is going to take care of many of them. And we ultimately see that line-drawing problem as inherent in Congress's choice to use this broad, capacious term relating to. And the way you have dealt with that... Don't you think it's odd, though, that, as I think Justice Jackson alluded to, that this is simply a conforming amendment, and it's doing so much substantive work? No, not at all. I fully agree with Mr. Clement's answer there. I think the reason you only see this argument in the anarchist brief and not in either of the red briefs is that there is just no way to get there textually. When Congress enacted the statute in 2011, this Court had, in over a dozen cases, said that relating to is a broad, capacious term, and then Congress puts that language in a statute that this Court, in five opinions, had said was a broad statute that was too deliberately construed. And so I just don't see how you can limit relating to to just this sort of narrow pre-suit discovery issue. And we also know that Congress wasn't focused on just that problem, because if you look at the very next page of the Act, Congress amends Section 1447D, which creates a right to appeal in every federal officer removal case. And everyone agrees that that provision is not limited to pre-suit discovery actions. That was the basis for this Court's BP decision a few years ago. And so I think it's clear from the text and context that Congress was addressing a broader issue here. Well, you're right, obviously, that relating to is very broad, but it's hard to see where you stop. I mean, is it a butterfly effect? You know, the butterfly flaps its wings and has the end result halfway around the world? So the way this Court has dealt with this problem in the preemption context, which we think is instructive here, is in one of two ways. So first, in one set of cases, like Morales, what you said is that this is an easy case, there are going to be hard ones, and we leave those line-drawing problems for another day. But, of course, in the course of such an opinion, you would presumably explain why this is an easy case, namely that abgas, or that crude oil, is the indispensable ingredient in abgas, and that the federal government itself recognized this link contemporaneously. And while I wouldn't want to suggest that those facts are somehow talismanic, in the ordinary course of common law adjudication, that is going to provide guidance to the lower courts in how to deal with it. So he wants to do the same thing we did in the prior case and just say, well, there might be hard cases down the line. But we're not – I mean, how many times are we supposed to say that? Sure. So that's option one of how to write the opinion. Option two is, I agree with what Mr. Clement said, which is you say what you said in Watson and what you've done in the ERISA context, which is if you want to try to put more meat on the bones, you look to the statutory history, the context, the objectives. And here this court has a deep body of precedent going back to 1880 that is explaining the objectives of federal officer removal, most importantly protecting the federal government from interference with its operation. And to operationalize that, I agree with Mr. Clement, what we would want to do is just ask, if the defendant had been enjoined at the time, would that have impaired his ability, interfered with his ability to assist the federal government? And here the answer to that question is obviously yes, when we are talking about the production of the indispensable ingredient in a critical military product and when the federal government banned many of the specific practices respondents stated. So could you summarize that into a test of some sort? It seems to be part of your argument in your brief that the goals of the federal officer removal statute can provide a useful limit on the seemingly expansive reach of the relating to phrase, but how do you articulate that? Yes, so the question we would ask is, would enjoining the charge conduct at the time have impaired the defendant's ability to assist the federal government? So suppose, for example... Isn't that going to be true of any federal contractor? Presumably a federal contractor is doing something that the federal government needs. So if you enjoin the federal contractor, you're going to be impairing the operations of the federal government. That seems as though you have a federal contract, so you meet your test. No, I think that's going to fail in two respects. So one, you're going to have this sort of category of cases that are collateral to the contract. I mean, the oil companies here are doing all sorts of stuff besides refining avgas, and if we're talking about a lawsuit against their petroleum jelly factory or their plastics factory, that seems less likely to directly impede the avgas refining. And you're also going to have stuff that is just sort of too far up the supply chain, where you're getting so attenuated that, you know, this is the one product that, the one ingredient that maybe they were using but everyone else wasn't using. Well, you just said directly impede, and Mr. Clement took that word out of Justice Kavanaugh's formulation. Yes. Notably. I would not put that... And I can easily see that in different product lines, one might say, I have a contract in one product line, but over here, interference over here in another product line will impair my ability to meet my government contract in the first thoughts. I think courts can exercise a degree of common sense and say, you know, that is not plausible. It is too attenuated. Because remember here, this is the usual... So you'd have us put direct into Mr. Clement. I would not put direct in the test. You wouldn't. It is direct. I think you said direct in response to Justice Kagan, so I'm just trying to get... Sure. If it's direct, I think it's obvious. But I think we know that it can't be direct because that's the sort of language of proximate causation. Back to the chief's butterfly effect problem, then. Yeah, I mean, I think in the butterfly... The big bang is related to you being here today, counsel, right? Of course. I think what you say in that context is I think courts are going to take these cases as they have in the ERISA context and the preemption context, and I don't think we have seen that flood of cases in the airline deregulation context, for example. I think courts have applied sense and said airline advertising is related to airline rates, but maybe if we're talking about a strike at the mechanics plant, wherever, that is going to be too attenuated. And maybe, you know, some clever... Mr. Clement can come up with some theory of why that is related, but I think courts... Oh, I guarantee you he would. Yes, and I think courts have not struggled with that. At the end of the day, this Court has offered these guideposts, and of course there are going to be hard cases, and I don't want to run away from that. I think, though, that is inherent in Congress's choice in picking this language. Because remember, Congress is enacting the statutes in 2011 after Justice Scalia's concurrence in Dillingham saying our ERISA preemption test is too hard to apply, after his concurrence in Egglehop, and so Congress came in here, eyes wide open, knowing that relating to is a broad term and... But Congress also said what it was doing in the report. This is the thing that is a little troublesome for me, that to the extent that you are relying on arguments about what Congress actually intended, as opposed to just looking at the words of the statute, it seems to me we're in the territory where we look at the House report and see what Congress said about what it was doing. And in the House report, Congress described the existing causal nexus requirement, saying that federal officers, quote, between the charged conduct and the asserted official authority. And in the testimony Congress looked at during that time, consistently people said we're not trying to change that standard. So if we are interested in being consistent with what Congress intended, I don't understand why the evidence doesn't show that Congress was not trying to change this standard. So we see a difference between identifying statutory objectives by looking to this Court's 150 years of case law, applying this statute, and looking in the specific House report. No, but you said Congress is coming in eyes wide open relative to our case law. And what I'm saying is yes, and then they wrote what it is that they were trying to do in the report. And to be clear, we absolutely agree that the motivating event for this Act was that a Congresswoman found herself stuck in state court in a subpoena case, and Congress didn't like that result and wanted to make sure that the Congresswoman could have her case in federal court. But I don't think it follows that that specific problem that motivated the Act is the breadth, is the sum total of what Congress did. And I'll, I think, offer the same answer as Mr. Clement, which is we know that from the text. And, of course, we also know that page 6 of the House report, the section-by-section analysis — Do you think they lose if I disagree with you? So as a — Do you not — do they not meet the causal nexus test, too? We would say that the relating to theory does not meet the pre-2011 test, but it does meet causation in a sort of broad sense of the word. So, I mean, on these facts, does Chevron lose if we disagree with you about the causal nexus requirement? No, for two reasons. First, we, of course, have our alternative argument that the Petroleum Administration for War was supervising all of this directly, causally, et cetera. We also think that there is causation here, if you want to call it that, in a sort of looser, broader sense of the word, that relating to would clearly encompass along the lines of Justice Alito's concurrence in Ford Motor Company, exploring this question in the personal jurisdiction context, because we know that the reason that these companies were refining their own crude oil was not a matter of happenstance. It was because the federal government specifically told them to do that because, in part, this crude was uniquely suited for making avgas. And we also have causation here at a broader scale in that there's no question that these oil companies generally increase production to meet their needs, and so the only difference here comes from the happenstance of respondents having tried to slice this case up. Thank you, Counsel. Justice Thomas? Justice Sotomayor? Justice Kagan? I'll give you a hypo, Mr. Roper. Suppose there's an airline crash of some kind, and somebody brings a lawsuit. It's a private airline, and somebody brings a lawsuit and says, there's a defective part. And the airplane manufacturing company says, you know, this part that you're talking about, it also goes into all the airplanes that we make for the federal government, which is a very substantial part of our business. So if you enjoin us from using this part, it's really going to affect the federal government. Does that mean that that suit, which is a standard state tort suit, should be removed? And I assume there that the remedy is just for damages and not actually for an injunction against production of the part. In that case, I would say no, that is not removable, because, I mean, effectively what that remedy is asking for is the equivalent of an injunction against the use of the part in civilian planes. Of course, if they came in and said... But if they're just asking for damages, which would effectively prevent, you know, it's like, oh my gosh, if we're going to be subject to damages here, we'd better find another part. So that would affect the way that the federal government is going to... Maybe the federal government even asked for this part. I don't think that makes any relevant sense, because the measure of damages in that case is presumably pegged to the use of the part in the civilian plane. Of course, if they came in and said, state law permits us to get a universal injunction against the production of this part for anyone ever, that we would have much greater concerns about, because that would actually be impeding the federal government's conduct. But just a normal state law damages action for purely civilian conduct, no. What does it mean to have a colorable federal defense? So this Court's cases haven't fully explored that question. It's definitely something above frivolous. It seems to be, as we read the cases, a little bit more than that. But the basic gist of the cases, as we take it, is that when the defendant's story is that, you know, they were doing this because the federal government told them to do so, that should be a question that should ultimately be resolved in federal court. And one of the issues here, right, is that each of the three parts of this, you can always say, oh, well, that will be taken care of by the other prong of the test, but each of the three prongs is setting a really low bar, including the federal defense prong. It's not like you have to have a federal defense. You have to have a colorable federal defense, which is just barely above frivolous. Yes, and I think that that is intentional. When you think about the statute against the backdrop of Congress's authority under Article III to put every federal defense in federal court, and so Congress has created this exception to the well-pleaded complaint rule, and it has identified this subset of cases that most directly implicate the federal government. And we don't want that to be an extraordinarily high bar because, again, as Mr. Schmidt said, all we are talking about here is a forum, and when the defendant has a plausible story that the federal government told them to do this, that is a story we ultimately want to be resolved by a federal judge in federal court. In the context of this case, I don't think it casts any aspersions on the good people of Plaquemines Parish to say that when we're talking about liability for conduct the federal government directed during World War II, that is a question that should be resolved in federal court. Mr. Scorsese? Your argument in your brief had a lot to do with the production of crude as opposed to the refining activity. That wasn't a central feature of the petitioner's argument, and respondents contend that it was waived below. Thoughts? We definitely disagree that it's waived. If you look at page 6 of the amended removal petition, it is preserved, at least at that stage. I agree they did not continue to press it, but the reason that argument is in our brief... You're saying it was presented to the district court, but not to the court of appeals. Correct. I would say it's forfeited, but not waived. And we, of course, are happy to win on relating to. That's the part of the statute that applies directly to our officers. So we are, if anything, prefer the refinery theory. But the reason that that argument is in our brief is twofold. That's enough for me. Thank you. Appreciate it. Justice Kavanaugh? If we define relating to too narrowly, from your perspective, what are the effects on the federal government going forward? So, Justice Kavanaugh, we think it's important to remember that this statute comes out of some of the most intense moments of state and federal conflict in our nation's history, like Reconstruction, Prohibition, and the South Carolina Nullification Crisis. So we have deep concerns about cases that do have that risk of interfering with the federal government's operations proceeding in state court. This case is, of course, a poster child for that. A couple other buckets of cases that are of concern to us are, first, the sort of retaliation scenario that is laid out in Senator Lee's brief, where you have those assisting the federal government as contractors or in other ways with whatever is the controversial policy of the day being targeted by hostile states or localities who know not to go after the federal conduct itself, but sort of work around the margins to go after the federal contractor. And in that scenario, if you have a federal culpable defense and plausible allegations that the suit is relating to the federal conduct, we absolutely want that case in federal court. The other bucket that concerns us is the military contractor scenario. There's all of these failure-to-warrant asbestos cases that are cited at page 28 of Mr. Clement's brief. I think the logic of Louisiana's argument here is that all of those cases go to state court because the contractors were not acting under a federal officer and giving warnings. The government only said, use asbestos, and it didn't say anything about the warnings. And when we're talking about how federal contractors are implementing their federal contracts, especially in the military context, we definitely want a federal forum there as well. And does that worry extend to incentives for military contractors going forward then? Yes, that is also a concern as well. I mean, we think the Fifth Circuit's ruling here is really novel. This contractual directive test, we don't see anywhere in the statute or this court's prior cases. And the idea that you would need a specific term in the contract addressing everything that you might be sued over, we see as deeply unworkable and also problematic. Thank you. Justice Barrett. Justice Jackson. Thank you. Thank you, counsel. Mr. Aguinaldo. Thank you, Mr. Chief Justice, and may it please the court. The Federal Officer Removal Statute authorizes the removal of a civil action commenced against a person acting under a federal officer. As that statutory text suggests, you have to look at the complaint that actually commenced the civil action. That complaint tells you the acts by the defendant that are charged, and then you ask, did the defendant commit those charged acts under a federal officer? That is the straightforward reading of the statute that is reflected in the Watson Court's statement that a defendant may remove to federal court only if in committing the charged acts he was acting under a federal officer. And that's what we think makes this an easy case. Petitioners not only abandon below any argument that they were acting under a federal officer in committing the acts charged in our complaints, but they also told the district courts in italics that they did not need to be acting under a federal officer in committing those acts. And let me be specific about those acts that are actually charged because we now know, having gone to trial with Chevron down in Point LaHashe, that they do not dispute that they dumped billions of gallons of produced water from oil wells directly into our marsh both before and after 1980. That's why this is such a massive deal for the state of Louisiana. And that's why I think they abandon any theory that they acted in that misconduct way under a federal officer. All that is why I say we think this is an easy case and the court should affirm. I welcome the court's questions. How much can you rely on Watson, which is quite different factually? It's a heavily regulated company and it was pre-2011. So how much work does Watson actually do for you? Well, Your Honor, I think Watson is extremely important for us because one thing it does is it catalogs this court's cases going all the way back to Tennessee v. Davis where the court has said, and this culminated in Watson, the court said all of those precedents, when they're talking about acting under federal authority, they're talking about an agent of the federal government that is acting within the scope of his authority. That's the backdrop against which this court decided Watson. And so I think when you open your analysis section in Watson and you say that a defendant can only remove only if he engages in those charged acts while under a federal officer, I think that's what this court was summarizing was that entire backdrop of precedents that led up to Watson. Now I will say, Your Honor, I think the court's decision in Tennessee v. Davis, you look at the Willingham case, what Watson says in reflecting on all those precedents is that when we talk about an agent of the federal government acting within the scope of authority, we're asking about somebody which is basically executing federal duties, except they're doing that on behalf of a federal officer. And that's why we pointed out in the red brief this fundamental disconnect between this refinery theory, which we could not sue. We could not sue petitioners under our law on this refinery theory because we literally can't grab conduct that is 300 miles away in Port Arthur, Texas at a refinery and say that violates our coastal law. That disconnect on the one hand, whereas the charged conduct that we have outlined in the complaint is literally in the marsh in Plaquemines Parish. This court has never seen, and petitioners have not identified for you, any case where this court has basically mixed and matched the acting under conduct that satisfies prong one with whatever the conduct is that satisfies prong two. Now, my friends on the other side talked a lot about preemption, federal colorable defenses. If I could hit one thing strong this morning, it's this idea that they have a federal colorable defense. Justice Barrett, you asked about whether that's a live issue. I thought to myself, we don't actually have to speculate about how these defenses shake out because we've gone to trial. So if you go down to the public records there at Point LaHashe in Plaquemines Parish and you look at the 18-day trial that we had with Chevron, I said, my gosh, I'm going to read that transcript front to back and see how did this narrative of the federal government's bidding in World War II play out, and how did the preemption defense play out? And you know what? The jury heard crickets on that because none of that was raised in the Rozelle trial. I think that's as dead a giveaway as any. I think that for all the narrative you see in your briefs in the federal courts about how this is us targeting World War II conduct and everything they did was directed by federal officers, nothing like that in the actual state court proceedings. I think that's the exact same story that would play out in federal court. And you know, that's just a fundamental mismatch in practice. That's the reality, Justice Barrett. Mr. Aguinaldo, I have a question about whether you designated the parish's council to represent you in the Fifth Circuit. On pages 34 and 35 of your brief, you try to run away from the concession that council made before the Fifth Circuit on the acting underprong, and you say, well, Louisiana didn't appear. But didn't the council for the parishes represent you and appear on your behalf and concede that point? So a couple of things there, Justice Barrett. We were at council table for sure with the parishes. We've been in lockstep with the parishes the whole time. And so we ceded our argument time to the parishes to represent all of respondents here in the Fifth Circuit. No doubt about that. I do have to push back on the idea that we're running away from a concession because as you know from that part of our brief, we vehemently disagree that there was any concession. I mean, I think the whole point, if you look at our Fifth Circuit briefs in both Cameron and Plaquemines Parish, the whole point of those briefs was Watson. It's this mismatch. It's like we told the Fifth Circuit, look, they're coming to you with this idea that under their refining contracts they were acting under a federal officer, but we haven't sued. That was the whole point, and I think that's why you saw the Fifth Circuit take that on directly, and they rejected our argument, no doubt, unanimously. But that's the basis on which we won in the district courts. That was the whole argument that we pressed in our Fifth Circuit briefs. And if you listen to that argument audio, I mean, with all respect to my friends on the other side, I don't think that's a fair characterization of what we argued at oral argument in the Fifth Circuit. But you did – I mean, the Parish's counsel did speak on your behalf. So if I read that transcript differently, then it does bind you too. Your Honor, I'm happy to say yes. I think, as I say, we've been – we have a joint defense agreement. We've been consistent with my friends from the parishes the whole time. All I'm saying is that if you listen to that audio, and then you look at our briefs, and you look at the arguments we made in our bios here, we have been making the exact same argument the whole time, which is you could conceive of the federal – I mean, the federal refining contracts and the conduct under those contracts as acting under conduct if you had a suit that actually targeted refining activities. Mr. Argan, I have another question. Do you understand there to be a factual dispute about whether PAWS is a federal agency? So, Your Honor, we have pressed in our briefs below, and I think my friends from the parishes pressed in their red brief here, the fact that – the very textual point that if you look at the statute, it requires acting under a federal officer. And I think there's some dicta in the court's decision in Watson that – and I'm actually quoting that first sentence in the analysis section where the court refers to acting under an agency or officer. The statute itself requires acting under an officer. They've never identified a particular officer that they were purportedly acting under instructions from. I think a fortiori, if you were to look at the agency question, I don't think the statute actually allows them to come into federal court on the theory that they acted under a federal agency. But we have preserved that sort of threshold argument that, like, if you look at the right federal actor, there is no particular federal officer that they've identified. And then if you think of PAWS as an agency – and we've not spelled that latter argument out, Justice Barrett. I mean, I think that's one thing that, you know, is interesting. But in all candor, we haven't spelled it out. I'm a little concerned about what I see as the conflation of the different prongs in your argument. You've said a couple times that what we should be looking for is acting under conduct or did the defendant commit those acts while acting under a federal officer. And that's not the way I understood the statute to be read. I thought acting under was one prong, and it was related to the authority that you have as this defendant, whether you're a federal officer yourself or you're not, but you are acting under the authority of the federal government. And then we have the for or relating to any act. Mr. Clement says the who, the what. I see that, and you, I think, are collapsing them. So can you help me to understand why you're not? Sure. So if I could give you a textual response based on the statute and then just a response based on practice from the asbestos cases. So just as a textual matter, Your Honor, I think paragraph one in our red brief was very delicately crafted because I think the right way to interpret the statute is to say it's a focus on the subject in the preparatory language in 1442A1. If you look at PEDAP 182, the very first sentence, right, the subject there is a civil action. And then the rest of A1, what it's doing is telling you which civil actions may be removed. Now my friends on the other side want to make prong one about who can remove and prong two about what suits can be removed. Doesn't that follow from our case law? I guess I can't figure out how Willingham comes out the same way if you're right. Right, Your Honor. So what I'm saying is that on our view, if you ask, if you say that the rest of A1 basically asks which actions can be removed, the answer to prong one is which action, the action must be against a specific defendant. And the textual point I made in my opening is that if you take that phrase, a civil action commenced against a person acting under a federal officer, implicit in that language is a presupposition that that defendant has acted under a federal officer. Where do you go to find whether that defendant actually acted under a federal officer? The complaint is the one that actually commenced. Are you saying that the act must be directed by the federal, the act in question has to be directed by the federal officer in order to give grounds for removal? No, Your Honor. Is that what you're saying? No, Your Honor. And that's why I think this attack from the other side on that point is a bit misleading. So let me go to the asbestos cases because we actually agree with pages 31 and 32 of Mr. Clement. But I mean that is what the Fifth Circuit said here, didn't it? I mean that was the basis for the Fifth Circuit's ruling, was that the production of the crude was not directed by the contracts. And so that's why, right? I mean am I wrong about that? So I think you're right, Your Honor. But I think what the Fifth Circuit was recognizing is the mismatch problem that we outlined in our red brief. They tried to solve that problem at prong two. And our humble submission was that you should just solve that problem at prong one. Now if I could tell you why I agree with Mr. Clement's description of the asbestos cases and how they shake out pre- and post-2011, remember the basic fact pattern in those cases is you've got a federal contract that says, contractor, you go refurbish a Navy ship and you install asbestos. So pre-2011, if there's a failure-to-warn claim about the asbestos being installed, the courts say in the Lachulet panel in the Fifth Circuit, which had that same fact pattern, said this doesn't suffice for federal officer removal because the claim is not for an act that was directed by the federal government. Now post-2011, you've got related to, as Mr. Clement says, once there's a failure-to-warn claim, it may not be that the federal government said specify these warnings or don't include warnings, but that doesn't matter. And that's why you have the outcome in Lachulet 2, the en banc decision from the Fifth Circuit that says, like look, when you engaged in the act of installing asbestos, unquestionably that is an act under a federal officer. That's prong one. And so the only question remaining is prong two. Is your failure to submit safety warnings or submit safety gear to your employees related to that act under a federal officer? That's why I think the idea that our theory somehow dooms federal government contracting, as we know it doesn't hold up because we're perfectly consistent with the asbestos cases that I think are the prototypical cases where you're going to see government contractors come to court and say we deserve to be in federal court because we installed asbestos pursuant to the government's contract. I think that's the important piece. Justice Jackson, you asked about but-for causation. I'd like to talk about the test for my friends on the other side and trying to answer the court's limiting principle questions about how far does relating to go. Now I'll pick up where Mr. Clement did, which was with his colloquy with Judge Engelhardt at the very end of our argument in the Fifth Circuit where Judge Engelhardt asked him, are you basically saying that this is a but-for causation standard? And Mr. Clement says yes, as he says today. And I was a bit taken aback by that because they don't have a but-for causation argument in this case. Think about it. There is no argument that but-for the ABGAS refining contracts, they would not have engaged in, for example, dumping produced water from oil wells into the marsh. One way we know that, if you look at the PAW history book, look at page 176, 189, what that history recounts is that 70% of the creation's crude oil was actually going to civilian use, not military use, civilian use. Our expert cites that at JA67. And the whole point is that industry would have been engaged in the exact same conduct that we in charge in our complaints, whether or not an ABGAS refining contract existed. And I think, to your point, Justice Barrett, about open questions in the case, that is one of the most important things because for all of the narrative, from my friends on the other side, that this was a natural consequence of their ABGAS refining contracts, that is inconsistent with the historical record. And so I think that is the answer on but-for causation, Your Honor. And so if that is the outer limit of their test, then as a factual matter, whether we win it here or we win it back on remand, we are going to win that issue because there is no argument that but-for the ABGAS refining contracts, they would not have engaged in, for example, the dumping of produced water into the marsh. Now the other thing I would add to that is just the argument that I take my friends, we talked about the narrative in World War II. There was a line from Judge Oldham in dissent below that said it is hard to tell how they would have been able to satisfy their ABGAS refining contracts if they had not produced oil. And respectfully, that too is directly contrary to the record. For one thing, just look at pages 217 and 218 of the PAW history book. The problem, and this is a section called the Gulf Coast Surplus, the problem that Louisiana refineries had during the World War II era that my friends want to focus on is they had too much oil. There wasn't enough transportation to take oil throughout the rest of the country, and that overstimulation, that oversupply of oil on the Gulf Coast meant that there was a serious concern that the refineries would actually have to close for lack of storage capacity. That's in the PAW history book, and what they say is that throughout the war, that the refineries actually had to operate at 70% capacity of pre-war levels just to avoid this oversupply of crude oil running them over. I take my friends, I understand they want to make this case about World War II. With all due respect, our experience in the Point LaHasse trial in Plaquemines Parish and the historical record, the sites I just gave you directly contradict that narrative. And if the court has no further questions, Mr. Giesbrecht. Can I give you an opportunity to respond to the amicus brief from General Myers and Admiral Mullen, which says, among other things, that the Fifth Circuit's approach would set a dangerous precedent that could adversely impact our national security, discouraging private parties from taking direction from federal officers for fear of future liability, potentially weakens our armed forces while strengthening our enemies. Devastating implications for our national defense are not hypothetical. After September 11th, for example, our nation needed specialized protective equipment, which the military did not have. If private sector parties producing equipment had said no, fearing future liability, that would have left our troops at great risk. So I just want to give you an opportunity to respond to that fairly strongly worded amicus brief from General Myers and Admiral Mullen. Yes, Justice Kavanaugh. The thing I'd say to that is my friends on the other side say we're trying to take the court's precedence back to pre-2011 standard. I think if that were true, then we would have seen evidence of all of this parade of horribles for the decades that this court's removal precedence required exactly what they say we're trying to return the court to. You don't see anything in those briefs, and I admit the rhetoric's strong, but where are the examples of the government contractors who said, man, before 2011, because of the federal officer removal statute, the way it's been interpreted by the Supreme Court, we're not going to engage in contracting like we'd like to. You don't see anything in the amicus briefs on that point, Your Honor. And so I think you should take the rhetoric from lawyers' pens for what it is. And I made the point with Justice Jackson earlier that our theory of the case is perfectly consistent with all of the asbestos cases, which is the mine run removal case that the federal courts are going to see. And so with all due respect, the rhetoric is unfounded. Mr. Chief Justice. Thank you, Counsel. Justice Thomas. As a practical matter, what difference does it make to be in state court as opposed to federal court? Well, Justice Thomas, I'm not going to lie. We have the same reasons for wanting to be in state court that anybody who sues under state law wants to be in state court. We want the actual experts interpreting state law, especially when we get to the Louisiana Supreme Court on an important statute like this, and especially with respect to a problem that is so sweeping in scope. Justice O'Meara. If you were to lose on the acting under, do you automatically lose on the relating? If we accept the Fifth Circuit's view, then how do you win? So the answer is no, Your Honor. I'll admit it's a harder question, but I think we still win for exactly the reason I was articulating earlier to Justice Jackson, which is if you want to take my friends on the other side as asking you to adopt a but-for test, well, look at the facts in this case and ask. But-for these AFGAS refining contracts, would they have to— What do you do with the relating-to language? So, Your Honor, as we've said from our bio and through the red brief, we've interpreted the relating-to language with respect to this court's decision moralis, I think in lockstep with how my friends on the other side have interpreted it. In fact, that's the very language that the court below and the en banc court in Latchley and the Fifth Circuit's decision in Latchley adopted. We have no quarrel with all of that black-letter language. I think the question is, on particular facts, how does that test shake out? And what I'm saying when I reference the but-for causation standard that I heard from my friends on the other side, like, ask how that shakes out. It does not shake out for them on this historical record. Justice Kagan? And could you respond to the solicitor general's alternative argument, just so I'm sure I know what your view of that is? So, Your Honor, our front-line position, I mean, we cited Docket Entry 87, which was their advisement to the district courts that they were going to file a cert petition in this court on that alternative theory and that they were only preserving that theory pending this court's resolution of it. After you denied cert in Plaquemines 2, you never saw that theory again from my friends. And, you know, we raised the problem in our bios. We said at pages 19 to 22, this is a problem for you. My friends from the parish just cited it at page 29. They said, like, Watson's a problem for you. You never saw this alternative theory in the cert reply or the opening blue brief, right? And so that's our top-line response, Your Honor, is that, like, this is – they made a strategic choice, a heavily lawyered case on the other side of this case. They made a strategic choice to say, like, obviously, the Plaquemines 2 decision says what it says. We're not going to press it anymore. How about a substantive response? So a substantive response, Your Honor, and I'll say we're not scared of the argument for one reason. My friend Mr. Clement quoted from you the heading starting the chapter on oil production in the PAW history that says oil starts in the ground. I ask you to read the conclusion. Read page 189 that says the government's treatment of production of oil in World War II was subject to a minimum of regulation. That's a direct quote. That's the federal government's own conception of what it did. And the way we know that, Your Honor, if you look at page 176, is a key part of how the federal government treated the actual production. This is far upstream. The production of crude oil, they left that to the states. The only thing they did each month was say, states, we think this is a certain capacity you could reach in terms of producing crude oil for this month. And then, and this is actual language in the PAW history, it says, we're leaving it to the state regulatory agencies to determine how to implement that if they so wish. That's minimum regulation, Your Honor. So if you're looking at Watson and you stack that up against the historical record on that alternative theory, that theory fails 100 days out of 100. Justice Gorsuch? On the relating to point, I didn't hear you make an argument that it's a mere conforming amendment once. So Justice Gorsuch, the record is undisputed that it is a conforming amendment. If you look at the heading, No, I understand that. That's not really my question. I'm trying to get at, did it do nothing? Or do those words that Congress added mean something? And I didn't hear you contest that they mean something. In fact, the test is a very broad one. You concede in your brief. You're right about that. So they absolutely mean something, Justice Gorsuch. And I think the way I'd approach that question is to say two things. What does Section 2B in the Act do? The big amendment in the 2011 Act was to change what is now D-1 to redefine a civil action. As my friend from the government said, the whole point was to capture pre-suit discovery procedures. So that's why you see D-1, what is currently D-1 in the statute, this redefinition. Section 2B, conforming amendments. Conforming to what? I mean, I think what Congress was trying to do by adding the phrase relating to. I understand that. But there's been a suggestion that the result of that is that it doesn't change the standard, and it remains for, and not for or relating to. But I don't hear you in your briefs, at least, suggest that argument. I hear you admitting that relating to is quite a broad test. Your Honor, and we have. And I'm not going to back away from that. That is absolutely the case. Congress said what it said. It included the words it did. And that's why we think that stories like Lachulet in the asbestos cases, those two decisions from the Fifth Circuit that came out different ways, that's why they do. We're completely comfortable with that. And the only reason I bring that up is to say the mismatch issue in this case. No, I understand the mismatch point. But you agree that those words have meaning and that they change the meaning of the statute. Absolutely, Justice Gorsuch. Absolutely. Justice Kavanaugh? Justice Fair? Justice Jackson? Thank you, Counsel. Rebuttal, Mr. Clement? Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, let me start with the one and only thing I disagree with the government about, and that is we did not forfeit this argument in the Fifth Circuit. We stopped making the argument because we lost in Plaquemines 2 and then had cert denied. And I think it's really important for those of us that practice appellate law that in that posture, you don't have to keep making the argument at various stages of the case. The VMI cert deny sort of says that. The NFL cert denied says that. So unless you are going to all of a sudden have appellate lawyers have to lard up their appellate briefs with arguments that are already foreclosed by appellate precedent in that circuit, I think it's very important not to find any forfeiture here. Now, I would say two other things. First of all, I think the second question presented is broad enough to capture this theory. And in all events, if anybody's opened the door wide open to a discussion of the acting underprong, it is my friends on the other side. So I think we are perfectly—the FG's theory, which is our theory from Plaquemines 2, is squarely before this court. A couple of other quick points. First, on the war. The war context of this is critical. My friend says, well, 70% of the production out of the fields went to civilian uses. Civilian uses in World War II were the home front. They were like fueling the factories that were making munitions. And if you read the Petroleum Administration for War History, it makes this point that the reason the federal government was all over this is that oil was absolutely essential to everything, including the home front. And if we are going to get in a big debate about exactly what happened in World War II, boy, I think first that should take place in federal court. And second, you should probably take a look at the FG's brief, including at pages 6 or 7, when they point out that there were regulations that go down to the level of the drilling angles and the production. Now, as to the statutory text, I think it's important that if you look at the statutory text that's in the U.S. Code, this isn't even a close case. Related to is in there. It's broad as can be. Now, I'd hate to have a world where all of a sudden, like, my U.S. Code has to have yellow highlighting on certain words because they were put into the code by a conforming amendment. And all of a sudden, I should take those words less seriously or figure out what else Congress is trying to do in 2011 and limit the words that are there in black and white. I think that's a dangerous path to go down. But if you're going to go down the path of legislative history, the phrase that we've all on our side relied on from the House report, it's not some stray comment. It is the section-by-section explanation for what they're doing with rewriting the statute. That's the words of the House report. And it's to broaden the universe of acts that enable removal. So Congress actually knew what it was doing here. Last point on the test. If you're going to have a verbal formulation, please don't have the word direct in it. I actually think, though, that maybe the better path here is to say that there are three or four factors about this case. That it's the indispensable component. That the contract itself mentions the connection. That the war effort is directly interfered with if this isn't joined. And leave it at that. Thank you, Your Honor. Thank you, Counsel. The case is submitted.